UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 19mj 3624- Reid

UNITED STATES OF AMERICA

v.

MAURICIO CORDOBA,
XAXAVI ISOLIS LOPEZ-NIEVES, AND
MIGUEL ANGEL ZAMBRANA-OJEDA,

        **Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? __Yes _X_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? __Yes _X_ No

                Respectfully submitted,

                ARIANA FAJARDO ORSHAN
                UNITED STATES ATTORNEY

BY:    _____
        STEPHANIE HAUSER
        ASSISTANT UNITED STATES ATTORNEY
        Florida Bar No. 92765
        99 NE 4th Street
        Miami, Florida 33132
        Tel: (305) 961-9065
        Email: Stephanie.Hauser@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Mauricio CORDOBA, Xaxavi Isolis LOPEZ-NIEVES, and Miguel Angel ZAMBRANA-OJEDA,<br><br>*Defendant(s)* | Case No. 19 mj 3624 - Reid |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 12, 2019 through June 22, 2019__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Adrian Betancourt, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/24/2019

*Judge's signature*

City and state: Miami, Florida

Magistrate Judge Lisette M. Reid
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Adrian Betancourt, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), Department of Justice, and I have been so employed since March 2010. Prior to joining the DEA, I was a Federal Air Marshal for eight years and a Detention & Removal Officer with the Immigration and Naturalization Service for one year. I have completed in excess of 640 hours of Basic Agent Training at the United States Justice Training Center, DEA, located in Quantico, Virginia. I have been trained in techniques dealing with the unlawful distribution of narcotics, possession and/or manufacture with intent to distribute controlled substance, use of communication facilities to conduct narcotics transactions, and associated conspiracies, in violation of Title 21, United States Code. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, Section 2516.

2. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that, in or around June 2019, in Miami-Dade County, in the Southern District of Florida, **Mauricio CORDOBA**, **Xaxavi Isolis LOPEZ-NIEVES**, and **Miguel Angel ZAMBRANA-OJEDA** knowingly engaged in a conspiracy to possess and distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), and 846.

3. The information contained within this affidavit is based upon my personal observations, training, and on information related to me by other law enforcement officers and investigators. The information herein also is based information provided by a DEA confidential source ("CS"), and a review of audio recordings made by devices that were used during the

investigation. The CS has proven reliable and has assisted in other Federal and State narcotics investigations. The CS's information has been corroborated throughout this and other investigations. This affidavit is intended to detail sufficient probable cause for the complaint, and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4. On or about June 10, 2019, the CS informed agents that **CORDOBA** had access to a cocaine source of supply ("SOS") from Puerto Rico, and that **CORDOBA** was interested in purchasing kilograms of cocaine from the SOS on regular bases to distribute in South Florida. In addition, the CS informed agents that **CORDOBA** was interested in meeting the CS because **CORDOBA** did not have clients to purchase the cocaine, and wanted the CS to broker and find clients to purchase the cocaine.

5. On June 13, 2019, at the instruction of agents, the CS met with **CORDOBA** and J.S. at **CORDOBA**'s residence in Miami Beach, Florida. J.S. coordinated the meeting, and introduced the CS to **CORDOBA**. The CS was equipped with a digital audio recording device to record audio of the meeting. The following summary of the June 13, 2019 meeting is based upon information provided by the CS and review of the audio recording from the meeting. Unless otherwise noted, the below-described conversations between the CS and **CORDOBA**, are not verbatim, but rather are set forth in sum and substance.

6. On the audio recording of the June 13, 2019 meeting, **CORDOBA** can be heard making references to "ounces," "kilograms," and "units." Based on my training and experience, I am aware that drug traffickers do not usually refer to cocaine explicitly, and typically use abbreviations, code words, and units of measurement to describe cocaine. Based on my training and experience and knowledge of this investigation, I believe that **CORDOBA** used "kilograms"

2

and "units" to refer to kilograms of cocaine. In addition, during the June 13, 2019 meeting, the CS referred to cocaine as "*perico*," which, based on my training and experience and knowledge of this investigation, I am aware is a Spanish slang word for cocaine.

7. During the June 13, 2019 meeting, **CORDOBA** informed the CS that he had a SOS for "kilograms," and that he was able to obtain "kilograms" on weekly bases to distribute. **CORDOBA** described the SOS as a woman from Puerto Rico. **CORDOBA** expressed his need to find buyers, and his preference for a buyer who was willing and able to distribute "kilograms," not "ounces." During the meeting, the CS proposed to buy two "kilograms" from **CORDOBA** on a weekly base, and **CORDOBA** agreed. In addition, **CORDOBA** informed the CS that his SOS was charging him U.S. $30,000 per kilogram but that he was trying to get a lower price. The CS informed **CORDOBA** that he/she could pay **CORDOBA** up to U.S. $32,000 per kilogram since the CS was going to sell the kilograms of cocaine in the inner city to traffickers of crack cocaine. Based on my training and experience, I am aware that the street value of cocaine is from the mid-$20,000 range to the low $30,000 range in the South Florida area.

8. During the June 13, 2019 meeting, **CORDOBA** went into another room, and returned with what appeared to the CS to be a bag of cocaine. **CORDOBA** offered cocaine to both the CS and J.S. for consumption, and **CORDOBA** and J.S. tried samples of the cocaine. **CORDOBA** also used a dye-pack field test kit to demonstrate the purity of the cocaine.

9. **CORDOBA** told the CS that **CORDOBA** would pay his SOS for two kilograms of cocaine on June 14, 2019 or June 15, 2019, and that the SOS would deliver the two kilograms of cocaine to **CORDOBA** on June 19, 2019.

10. On June 19, 2019, **CORDOBA** informed the CS that he would receive the two kilograms of cocaine on the night of June 20, 2019, and would be ready to deliver them to the CS.

At the instruction of agents, the CS ultimately scheduled to purchase the cocaine from **CORDOBA** on June 22, 2019 at approximately 1:00 p.m. in a Miami Beach parking lot.

11. On June 21, 2019, at the instruction of agents, the CS sent a photograph of a bundle of $20 notes to **CORDOBA** via WhatsApp.

12. On June 22, 2019, law enforcement established surveillance at the parking lot where the CS and **CORDOBA** agreed to meet. **CORBOBA** arrived at the parking lot driving a silver Land Rover, which law enforcement determined was registered to **CORDOBA**'s wife, D.J.C. **CORDOBA** parked next to the CS's vehicle, got out of his vehicle with a black duffel bag, and entered the CS's vehicle through the front passenger side door. While inside the CS's vehicle, **CORDOBA** retrieved a white plastic Sprint bag from the black duffel bag, and gave it to the CS. The white Sprint plastic bag contained two brick shaped white substances, each wrapped with clear cellophane. **CORDOBA** asked the CS if the photograph the CS had sent him the day before was the money, and the CS said yes. **CORDOBA** asked why they were all $20 notes, and the CS told him that $100 notes were easier to track. The CS then pretended like he/she had to place a call to have the money delivered, but instead placed a call to law enforcement, as instructed by agents. Law enforcement then placed **CORDOBA** into custody, and seized the suspected cocaine. A subsequent field test of each brick confirmed the substance contained cocaine.

13. **CORDOBA** gave a post-*Miranda* statement, consented to a search of his phone, and agreed to cooperate with agents. **CORDOBA** identified **LOPEZ-NIEVES** as the woman from Puerto Rico who was the SOS. **CORDOBA** stated that after he met with the CS on June 13, 2019, he contacted **LOPEZ-NIEVES** and ordered two kilograms of cocaine. **CORDOBA** stated that **LOPEZ-NIEVES** sold him each kilogram of cocaine for $28,000, and required a portion of the payment up front. **CORDOBA** stated that, on June 14, 2019, **LOPEZ-NIEVES** and

4

**ZAMBRANA-OJEDA** drove to his residence to collect the first installment payment. On **CORDOBA**'s phone there was a message on June 14, 2019 at 2:23 p.m. from **LOPEZ-NIEVES**'s phone, in which she stated she was in the lobby of **CORDOBA**'s apartment building. **CORDOBA** stated that, on June 14, 2019, he met with **LOPEZ-NIEVES** and **ZAMBRANA-OJEDA** inside a vehicle, and that he gave **LOPEZ-NIEVES** and **ZAMBRANA-OJEDA** $28,000 in cash, which they both counted in front of him.

14. **CORDOBA** also stated that, on June 21, 2019, **LOPEZ-NIEVES** and **ZAMBRANA-OJEDA** made two deliveries at his apartment building of one kilogram of cocaine each time. **CORDOBA** told law enforcement that **CORDOBA** and **LOPEZ-NIEVES** agreed that once **CORDOBA** sold the two kilograms to the CS on June 22, 2019, they would meet again that same day at **CORDOBA**'s residence so that **CORDOBA** could pay **LOPEZ-NIEVES** the remaining money due for the two kilograms.

15. On June 22, 2019, at approximately 1:36 p.m., **CORDOBA** received a message from **LOPEZ-NIEVES** saying that she was in the area and to let her know once he was done.

16. At the direction of agents, **CORDOBA** responded to **LOPEZ-NIEVES** that the transaction went well, and that he was ready to deliver the remaining money to her. **CORDOBA** directed **LOPEZ-NIEVES** to drive inside the parking garage at his residence and park near parking area P3.

17. Law enforcement established surveillance at the parking garage. At approximately 3:05 p.m., agents observed a black Ford Explorer, occupied by a male driver, later identified as **ZAMBRANA-OJEDA**, and a female passenger, later identified as **LOPEZ-NIEVES**, pull into the P3 area of the parking garage. At approximately 3:09 p.m., **CORDOBA** received a message from **LOPEZ-NIEVES** stating, "I am here." Soon after, agents observed the Ford Explorer leave

the P3 area. **CORDOBA** then received a phone call, which was placed on speaker phone and monitored by agents, from **LOPEZ-NIEVES**. The female on the other end of the conversation informed **CORDOBA** that she saw a suspicious vehicle in the P3 area, and instead wanted to meet by the lobby of the building.

18. Law enforcement equipped **CORDOBA** with a digital audio recorder, and gave **CORDOBA** a bundle of sham U.S. currency to deliver to **LOPEZ-NIEVES**. Once inside the Ford Explorer, **CORDOBA** gave **LOPEZ-NIEVES** the sham U.S. currency. **CORDOBA** told **LOPEZ-NIEVES** that the guy he just delivered the two kilograms to was a serious buyer, and wanted two more kilograms for Wednesday. **LOPEZ-NIEVES** replied by saying "for Wednesday, two more, OK." **LOPEZ-NIEVES** asked **CORDOBA** how much was in the bundle of cash, and **CORDOBA** replied, $28,000. **LOPEZ-NIEVES** asked **CORDOBA** if she was going to get some money upfront for the next order, but then stated that she would figure it out. **ZAMBRANA-OJEDA** spoke little during the meeting. **CORDOBA** exited the vehicle, and law enforcement continued surveillance on the Ford Explorer.

19. Law enforcement stopped the Ford Explorer outside of **CORDOBA**'s apartment building on a public road. Both the driver, **ZAMBRANA-OJEDA**, and the passenger, **LOPEZ-NIEVES**, exited the Ford Explorer. **ZAMBRANA-OJEDA** was detained. **LOPEZ-NIEVES**, while being confronted by an agent, reached back into the vehicle, grabbed the sham U.S. currency that was given to her by **CORDOBA**, and threw the sham U.S. currency out of the car. **LOPEZ-NIEVES** then forcefully re-entered the Ford Explorer through the passenger side, and climbed into the driver's side of the vehicle. She then attempted to drive away while an agent tried to physically stop her. **LOPEZ-NIEVES** crashed the Ford Explorer into a city bus in front of her,

and then tried to reverse, before an agent removed the key from the vehicle's ignition. Law enforcement then detained **LOPEZ-NIEVES**.

20.     Post-*Miranda*, **LOPEZ-NIEVES** gave consent to search her phone. Law enforcement confirmed that **CORDOBA** and **LOPEZ-NIEVES** had been messaging with each other since at least as early as June 12, 2019. The messages between **CORDOBA** and **LOPEZ-NIEVES** corroborated the timeline of setting up the deal as explained to law enforcement by both the CS and **CORDOBA**. The messages between **CORDOBA** and **LOPEZ-NIEVES** contained reference to "K," "*cosos*," "g," and "*gramos*." Based on my training and experience and knowledge of this investigation, I believe that **LOPEZ-NIEVES** and **CORDOBA** used "K," "*cosos*," "g," and "*gramos*" to refer kilograms and grams of cocaine.

21.     **ZAMBRANA-OJEDA** also gave a post-*Miranda* statement, during which he described how he and **LOPEZ-NIEVES** purchased approximately one kilogram of cocaine for $23,000 in Puerto Rico, mailed it to a post office box in Miami, flew from Puerto Rico to Miami, retrieved the cocaine from the post office box, went to a hotel room in Doral, Florida, and cut the approximate one kilogram of cocaine into two kilograms. **ZAMBRANA-OJEDA** also claimed to have sent the messages from **LOPEZ-NIEVES'** phone to **CORDOBA**.

[THIS SECTION INTENTIONALLY LEFT BLANK]

## CONCLUSION

22. Based on the foregoing, I respectfully submit that there is probable cause to believe that **Mauricio CORDOBA**, **Xaxavi Isolis LOPEZ-NIEVES**, and **Miguel Angel ZAMBRANA-OJEDA** knowingly engaged in a conspiracy to possess and distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), and 846.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Adrian Betancourt, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this 24th day of June, 2019.

_____
HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

8